Filed 06/13/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| E.I.,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>EL SEGUNDO UNIFIED<br>SCHOOL DISTRICT,<br><br>　　Defendant and Appellant. | B325733<br><br><br>(Los Angeles County<br>Super. Ct. No. 19STCV14649) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael B. Harwin, Judge.  Affirmed.

　　　　Law Offices of Barber & Bauermeister, Linda Bauermeister and Robert Kostrenich for Defendant and Appellant.

　　　　Abir Cohen Treyzon Salo, Christa Ramey, Schyler Katz; S.C. Law, Siannah Collado; Esner, Chang, Boyer & Murphy, Holly N. Boyer, Shea S. Murphy, and Kevin N. Nguyen for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury awarded plaintiff E.I.[1] $1 million in damages after it found defendant El Segundo Unified School District (District) negligently failed to protect her from other students' bullying while she was a student at El Segundo Middle School (Middle School). On appeal, the District argues: (1) the trial court erred in allowing E.I. to rely on various provisions of the Education Code to support her negligence claim; (2) the District is immune from liability because any decision made by the Middle School employees in determining how to respond to E.I.'s complaints of bullying was discretionary under Government Code section 820.2; (3) E.I. failed to prove any of her injuries were caused by the negligence of the Middle School employees; (4) the court erred when it allowed the jury to consider a negligent training and supervision theory because E.I. dismissed her second cause of action for negligent hiring, retention, supervision, and training; (5) the court should have excluded testimony from one of E.I.'s expert witnesses; and (6) E.I.'s counsel engaged in misconduct during closing argument. As we explain, the District has waived or failed to develop many of these issues in their opening brief, and the remaining issues lack merit. Accordingly, we affirm.

## FACTUAL BACKGROUND

### 1.     The bullying

E.I. attended the Middle School during the 2017–2018 school year. She was friends with two other students, Kate B. and Skylar B. At some point during that school year, E.I. told Kate that she liked a boy whom Kate had recently dated. Kate told E.I. " 'no worries.' "

---

[1]     We use initials for the minors in the middle school.

When Skylar discovered E.I. was talking to Kate's ex-boyfriend, Skylar sent E.I. messages on social media accusing her of being a "cheater," a "whore," a "bitch," a "slut," and a "liar." Skylar began insulting E.I. at school, and she sometimes screamed at E.I., flipped her off, and, on one occasion, slapped her face. Teachers were present when Skylar engaged in some of this behavior, but they did not intervene or report it.

E.I. eventually complained about Skylar's behavior to one of the Middle School's counselors. At the principal's request, the counselor held a meeting with E.I., Skylar, and Kate on October 20, 2017. The counselor did not develop a plan for the meeting or share the school's anti-bullying policies with the girls. According to E.I., the girls had a "very superficial[]" discussion about what was happening between them and "nothing really ended from that."

On October 24, 2017, four days after meeting with Skylar and Kate, E.I. sent an e-mail to the school's counselor, asking to meet with her "as soon as possible." Skylar's behavior had "picked up" since the meeting, and she continued to send E.I. harassing messages and to yell at, and flip off, E.I. at school. Although the counselor met with E.I., she did not otherwise follow up on E.I.'s complaint. Because E.I. did not feel safe around other students, she started eating lunch by herself in the nurse's office.

In mid-November 2017, Skylar and E.I. engaged in the following exchange on social media:

Skylar:     "Fuck you
            u can just get the hell out of my life
            Ur a toxic friend"
E.I.:       "ok"

Skylar:    "I hate you
           Ur passive aggressive
           A li[a]r
           A toxic friend
           A bully
           A cheater
           And u make people feel like shit
           And u ruined all the memories I had with
           u
           We were fine until u lied
           Go lie to someone else
           Go kiss someone else's ass
           Like Grace
           Or anyone
           Idc
           Just get the hell out of my life
           And until u decide to be a descent [*sic*]
           human being u can forget about
           everything"
E.I.:      "what's everything[?]"
Skylar:    "Oh GO TO HELL
           I can take a lot of shit but u have pissed
           me off the [most]
           And I think u like it"
E.I.:      "why would I like any of this[?]"
Skylar:    "Bc u keep doing it"
E.I.:      "ok"
Skylar:    " 'Ok' "
E.I.:      "yes ok"
Skylar:    "That's all u got to say[?]"

E.I.: "If [I] say anything else you're going to yell or manipulate my words or something"

Skylar: "That's what u do
Hypocrite
U know what?"

E.I.: "what[?]"

Skylar: "Ur a fucking bitch and u don't deserve anyone that goes to that school and I hope they realize how deceiving and petty you are and u know what u can just live alone with cats the rest of ur life."

E.I. showed the messages to the school's counselor. E.I. also told the counselor that Skylar continued to harass her at school, and she asked the counselor for help with the situation. The counselor told E.I. that "girls will be girls" or that "[t]his is just girl drama."

Around the fall of 2017, E.I. began cutting her stomach because she "felt like [she] needed help with the situation and it wasn't being addressed. And [she] wanted someone to . . . see how . . . real and intense [the situation] was and . . . how it wasn't being looked at." When E.I.'s mother noticed that E.I. was cutting herself, E.I. explained that she was engaging in this behavior because of the loss of her "friendship that she had with [Skylar] and [Kate], and [that] it had to do with a boy." E.I. often came home from school "in tears," and she frequently asked her parents to pick her up early from school. E.I. also started seeing a therapist.

On November 26, 2017, E.I.'s mother e-mailed the Middle School's principal to request a meeting to address "disturbing

information" that required "immediate attention."  A couple of days later, E.I.'s mother and father met with the school's principal.  The parents showed the principal some of the messages that Skylar sent E.I. through social media, and E.I.'s father told the principal that E.I. did not feel safe attending school and that he was concerned that other students were bullying her.  The principal told E.I.'s parents, "Yes, I know who the mean girls are, and I'll do something about it."

On November 28, 2017, the Middle School held a "challenge day," where students broke off into small groups with teachers and administrators.  The event was intended to allow students to talk to school officials about issues that typically did not come up in class, such as their emotional well-being.  The administrator overseeing E.I.'s group was the school's former principal.  When E.I. told him about her issues with Skylar, he brushed over her comments and started talking to another student.

On November 29, 2017, the school's principal notified E.I.'s mother that she (the principal) met with E.I.  E.I. and the principal talked about Skylar and "getting to a place where there wouldn't be any hurtful messages being sent."  E.I. was open to "meeting in a restorative justice setting" with Skylar, which the principal promised to "definitely work on getting . . . to happen."

At some point in November or December 2017, E.I. blocked Skylar and Kate on her text messaging and social media accounts.  E.I. unblocked Skylar from her accounts in the spring of 2018.

Around January 2018, E.I. applied to a private high school outside the District.  Although she had planned to attend a high school within the District, she no longer felt safe doing so because of the bullying she continued to experience at the Middle School.

Skylar's bullying persisted throughout the remainder of the 2017–2018 school year. Skylar continued to confront E.I. on campus. In April 2018, Skylar initiated a text exchange with E.I. Skylar called E.I. a "bitch" and "irrelevant" and accused her of losing all her school friends. Skylar claimed that "the other 50" students in their grade were happy that E.I. was leaving the District, and Skylar ridiculed E.I. for eating lunch alone in the nurse's office. E.I. told the Middle School's counselor about Skylar's messages, but nothing was done to address them.

On June 12, 2018, E.I.'s class took a trip to Knott's Berry Farm. Skylar sent messages to E.I. throughout the day, claiming E.I. did not have any friends and teasing her for being alone at the theme park. At the end of the day, as E.I. walked back to the bus, Skylar and some of Skylar's friends approached E.I. and called her a "bitch," yelled profanities at her, flipped her off, and laughed at her. When E.I. got on the bus, she started crying. One of the teachers saw E.I. crying but did not say anything to her.

On June 13, 2018, E.I.'s parents met with the Middle School's principal. E.I.'s parents told the principal about the messages that Skylar sent E.I. while at the theme park and about how Skylar and her friends teased and cursed at E.I. as she returned to the bus. The principal responded that she " 'dropped the ball.' "

On the same day E.I.'s parents met with the principal, Skylar decided to create a petition titled, "Petition to END [E.I.'s] Life." K.S., another student at the Middle School, drafted and signed the petition, while other students wrote comments on it, like "KKK" and "she is a whore."

Two students reported the petition to the Middle School's counselor, who reported it to the principal. The principal eventually notified the police, and she met with Skylar, K.S., and their parents. No one from the school contacted E.I.'s parents. The principal did not view the petition as bullying. Instead, she believed it was just "wrong." The police later found the petition did not pose a credible threat of harm to E.I.

E.I.'s parents did not hear about the petition until late in the evening on the day it was circulated, when another student's mother contacted E.I.'s mother. E.I.'s father sent an e-mail to the Middle School's principal, demanding a meeting with her the following day or else he would " 'call the police.' " The principal responded, claiming "[w]ord of a potential issue came to the office at the end of the day," and that she intended to contact E.I.'s parents "as soon as [she] had substantial information." She promised that the school would fully investigate the petition "first thing in the morning" and that the "ESPD resource officers will be involved."

E.I. did not learn about the petition until June 14, 2018, when she and her parents met with the principal and the police. The principal informed E.I.'s family that Skylar and K.S. had been suspended. Nevertheless, Skylar was allowed to attend the school's promotion ceremony the next day.

E.I.'s psychologist testified that E.I. was diagnosed with posttraumatic stress disorder (PTSD) and an adjustment disorder with depressed mood and anxiety because of the bullying she experienced during the 2017–2018 school year. E.I. became more withdrawn and distant from other people. According to the psychologist, E.I.'s PTSD diagnosis was enduring and "doesn't go

away," and E.I. would need to continue to attend therapy for many years.

**2.    The District's and the Middle School's anti-bullying policies**

The District developed a "Comprehensive Safety Plan," which establishes, among other things, "appropriate strategies and programs that will provide or maintain a high level of school safety and address the school's procedures for complying with existing laws related to school safety, including . . . [¶] . . . [a] policy consistent with the prohibition against discrimination, harassment, intimidation, and bullying pursuant to the Education Code [sections] 200–262.4." The District's safety plan was modeled, in part, on the Education Code's provisions addressing school safety.

The District's safety plan states in relevant part, "[t]he Government Board recognizes the harmful effects of bullying on student learning and school attendance and desires to provide safe school environments that protect students from physical and emotional harm. District employees shall establish student safety as a high priority and shall not tolerate bullying of any student. [¶] No student or group of students shall, through physical, written, verbal, or other means, harass, sexually harass, threaten, intimidate, retaliate, cyberbully, cause bodily injury to, or commit hate violence against any student or school personnel." The safety plan defines cyberbullying, in part, as "the creation or transmission of harassing communications, direct threats, or other harmful texts, sounds, or images on the Internet, social media, or other technologies using a telephone, computer, or any wireless communication device."

9

Under the District's safety plan, schools shall, to the extent possible, "focus on the prevention of bullying by establishing clear rules for student conduct and implementing strategies to promote a positive, collaborative school climate. Students shall be informed, through student handbooks and other appropriate means, of district and school rules related to bullying, mechanisms available for reporting incidents of threats, and the consequences for engaging in bullying." School "[s]taff shall receive related professional development, including information about early warning signs of harassing/intimidating behaviors and effective response," and "[b]ased on an assessment of bullying incidents at school, the Superintendent or designee may increase supervision and security in areas where bullying most often occurs, such as classrooms, playgrounds, hallways, restrooms, and cafeterias."

The District's safety plan also establishes guidelines for preventing and reporting bullying. Students "are encouraged to notify school staff when they are being bullied or suspect that another student is being victimized." In addition, school "staff who witness an act of bullying shall immediately intervene to stop the incident when it is safe to do so." The superintendent also must notify the victim's and the perpetrator's parents "[w]hen appropriate based on the severity or pervasiveness of the bullying." Further, the superintendent, principal, or principal's designee "may refer a victim, witness, perpetrator, or other student affected by an act of bullying to a school counselor, school psychologist, social worker, child welfare attendance personnel, school nurse, or other school support service personnel for case management, counseling, and/or participation in a restorative justice program as appropriate."

In addition, the District's safety plan requires schools to document and investigate complaints of bullying. Specifically, the plan states that "[a]ny complaint of bullying, whether it is discriminatory or nondiscriminatory, shall be investigated and resolved in accordance with law and the district's uniform complaint procedures." Any student, parent, or other individual who believes a student has been bullied, or who has witnessed bullying, "may report the incident to a teacher, the principal, a compliance officer, or any other available school employee. Within one business day of receiving such a report, a staff member shall notify the principal of the report whether or not a uniform complaint is filed. Within two business days of receiving a report of bullying, the principal shall notify a district compliance officer . . . . In addition, any school employee who observes an incident of bullying involving a student shall, within one business day, report his/her observation to the principal or a district compliance officer, whether or not the alleged victim files a complaint." The school also must inform the alleged victim, or the alleged victim's parents, of the right to file a formal written complaint, and the alleged victim "shall be given an opportunity to describe the incident, identify witnesses who may have relevant information, and provide other evidence of bullying."

Under the District's safety plan, individuals who are aware of cyberbullying are encouraged to save and print the electronic messages that they believe constitute cyberbullying and to notify a teacher, the principal or another school employee so that the issue may be investigated. In addition, the superintendent may file a request with the networking site or service to suspend the privileges of the student and to have the bullying material removed.

11

The District's safety plan also provides guidelines for disciplining students who engage in bullying conduct.  The school may require a student who bullies another student to participate in "counseling, behavioral intervention and education," and, "if the behavior is severe or pervasive as defined in Education Code section 48900," the school may suspend or expel the student.  In addition, any "employee who permits or engages in bullying or retaliation related to bullying shall be subject to disciplinary action, up to and including dismissal."

The Middle School also developed its own safety plan, which was authored by the school's principal.  The Middle School's plan is based on the Education Code and largely mirrors the District's safety plan.

The District trained the Middle School employees how to respond when (1) receiving complaints of bullying or (2) witnessing students engaging in acts of bullying.

## PROCEDURAL BACKGROUND

In April 2019, E.I. sued the District, asserting causes of action for negligence and negligent hiring, retention, supervision, and training, both under Education Code section 44807 and Government Code sections 815.2, 815.4, 815.6, 820, and 835.  In her first cause of action for negligence, E.I. alleged, among other things, that the District and the Middle School employees owed a duty to protect her from other students' bullying and to supervise, and maintain discipline of, the Middle School's students, and that their breach of those duties caused her injuries.  In her second cause of action, E.I. alleged that the District owed her a duty to "adequately and properly investigate, screen, hire, train, monitor, place, evaluate, and supervise its instructors and employees in order to protect its students from

12

harm caused by other [] students on El Segundo Middle School's premises," and that the District's breach of that duty caused her injuries.

A jury trial commenced in August 2022. During trial, E.I. dismissed her second cause of action for negligent hiring, retention, supervision, and training. The jury found the District was negligent and that its negligence was a substantial factor in causing E.I.'s injuries. The jury awarded E.I. $1 million in damages, including $700,000 for past noneconomic damages and $300,000 for future noneconomic damages.

After the court entered judgment in E.I.'s favor, the District moved for a new trial and for judgment notwithstanding the verdict. The court denied both motions.

The District appeals.

## DISCUSSION

### 1. Education Code section 48900 et seq.

The District argues the court erred when it allowed E.I. to rely on Education Code sections 48900, 48900.5, 48900.7 and 48911 to prove the Middle School employees negligently failed to protect her from other students' bullying. According to the District, those provisions address when a school may punish a student for engaging in harmful or disruptive behavior, but they do not create any mandatory duties on the part of school personnel to protect students from other students' behavior. In other words, the District contends that "[t]he only proper construction of [those] statutes is that [E.I.] does not have a right to assert a right to protection thereunder." This argument is misguided.

Education Code sections 48900, 48900.5, 48900.7 and 48911 are "part of a comprehensive legislative scheme designed

13

to ensure procedural fairness in suspension and expulsion proceedings." (*Tirpak v. Los Angeles Unified School Dist.* (1986) 187 Cal.App.3d 639, 645.)  As the District points out, those provisions "do not expressly set forth a private cause of action for damages for breach of their provisions," nor do they create "a mandatory duty of care owed to plaintiffs with respect to economic damages arising from educational injury." (*Ibid.*)

But E.I. did not sue the District under Education Code section 48900, 48900.5, 48900.7 or 48911.  Nor did she cite those provisions in her operative first amended complaint or argue at trial that the District's liability arose out of those provisions. The court also did not instruct the jury on those provisions. Although E.I.'s expert testified about some of the steps the District could have taken under those provisions to discipline Skylar and address E.I.'s complaints of bullying, E.I. did not otherwise base her negligence claim on a theory that the Middle School employees breached a mandatory duty owed to her under those provisions.  Instead, E.I. brought her negligence claim against the District under Education Code section 44807 and Government Code sections 815.2, 815.4, 815.6, 820, and 835.

As our Supreme Court has explained, " 'California law has long imposed on school authorities a duty to "supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection." ' " (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869 (*C.A.*); see also *J.H. v. Los Angeles Unified School Dist.* (2010) 183 Cal.App.4th 123, 139 (*J.H.*) [the duty of school officials to always supervise the conduct of children on school grounds is "very, very well established"].)  This duty of care arises, in part, out of what is now Education Code

14

section 44807.  (See *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747; see also *Lucas v. Fresno Unified School Dist.* (1993) 14 Cal.App.4th 866, 872.)

It is well-settled that "a school district and its employees have a special relationship with the district's pupils, a relationship arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel, 'analogous in many ways to the relationship between parents and their children.' " (*C.A.*, *supra*, 53 Cal.4th at p. 869.)  Because of this special relationship, "the duty of care owed by school personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*C.A.*, at p. 870.)

" 'The standard of care imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties.  This uniform standard to which they are held is that degree of care "which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances." [Citations.]  Either a total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision.  Under section 815.2, subdivision (a) of the Government Code, a school district is vicariously liable for injuries proximately caused by such negligence.' " (*C.A., supra*, 53 Cal.4th at p. 869.)

Thus, independent of any obligations that may arise under Education Code sections 48900, 48900.5, 48900.7, and 48911, school officials owe a duty to students to supervise their conduct and protect them from harm while on school grounds.  (See *C.A.*,

15

*supra*, 53 Cal.4th at pp. 868–869.) The District's contention that the Middle School employees had no duty to protect E.I. from harm caused by other students is, therefore, meritless.

**2.    Immunity under Government Code section 820.2**

The District next contends it is immune from liability under Government Code section 820.2. Specifically, the District argues any decisions by the Middle School employees in determining how to respond to E.I.'s complaints of bullying were "discretionary" under that statute and, as a result, could not expose the District to any liability for those employees' failure to protect E.I. from other students' bullying. This argument also lacks merit.

Government Code section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

Immunity under Government Code section 820.2 is reserved for " ' "*basic policy decisions*" ' " that have been expressly committed to coordinate branches of government, and " 'as to which judicial interference would . . . be "unseemly." ' " (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685 (*Barner*).) That immunity does not extend to "lower level decisions that merely implement a basic policy already formulated." (*Ibid.*) Indeed, "not all acts requiring a public employee to choose among alternatives entail the use of 'discretion' within the meaning of [Government Code] section 820.2." (*Id.* at pp. 684–685, citing *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 981 (*Caldwell*).)

In *Barner*, the Supreme Court held that a deputy public defender is not immune from civil liability under Government

16

Code section 820.2 for his or her acts or omissions in representing a criminal defendant.  (*Barner*, *supra*, 24 Cal.4th at pp. 679–680, 686–692.)  The court explained that while a deputy public defender's decision to represent a particular client may qualify as an immune "discretionary" act, "once the employee undertakes to render such services, he or she is not immune for the negligent performance of professional duties that do not amount to policy or planning decisions."  (*Id*. at p. 686.)  That is, "legal representation provided by a deputy public defender entails operational (as opposed to policy) decisions that are incident to the normal functions of the office of the public defender."  (*Id*. at p. 680.)

The Supreme Court rejected the deputy public defender's argument that an attorney's decision whether to file a certain motion, as opposed to what information should be included in a motion once the attorney has decided to file one, "is inherently discretionary and should not be subject to later judicial scrutiny in a civil action."  (*Barner*, *supra*, 24 Cal.4th at p. 688.)  While both decisions involve "the exercise of professional judgment in light of an evaluation of all the circumstances of the case," the Supreme Court explained, neither one is "a sensitive decision implicating fundamental policy concerns warranting judicial abstention."  (*Id*. at p. 689.)

The Supreme Court also identified other public employees who are not immune from liability for certain acts that they perform in the scope of their employment, even though some of those acts may involve some level of discretionary decision making.  For instance, government medical doctors are not immune from liability when they act negligently during an "examination or diagnosis performed for the purpose of treating [an] individual."  (*Barner*, *supra*, 24 Cal.4th at pp. 687–688.)

17

Likewise, government psychologists "are not immune from liability under [Government] Code section 820.2 for the failure to warn a third person of a risk of harm posed by a patient," even though the decision whether to disclose such a risk "may require the exercise of considerable judgmental skills." (*Id.* at p. 686, citing *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425.) Such decisions are not insulated from liability because they do "not rise to the level of a basic policy decision for which the statute provides immunity." (*Barner*, at p. 686.)

Here, E.I.'s negligence claim was based on a theory that the Middle School employees negligently failed to protect her from other students' bullying. To support that claim, E.I. presented evidence that she and her parents repeatedly reported Skylar's bullying to the Middle School's principal and counselor, and that several members of the Middle School's staff, including some teachers, witnessed Skylar's bullying but failed to do anything to address it. E.I. also presented evidence of the District's and the Middle School's safety policies, which established procedures and guidelines for District and Middle School employees to follow when witnessing, or receiving reports of, bullying. Those policies outlined, among other things, when and how those employees should investigate alleged incidents of bullying, how to discipline students who engage in bullying, and how to help students who are victims of bullying. E.I. also presented evidence that the Middle School employees, including the principal and the counselor, did not follow many of those procedures and guidelines once she and her parents reported Skylar's bullying.

Applying *Barner*'s rationale, the District is not immune from liability arising out of the Middle School employees' responses to E.I.'s complaints that she was being bullied by other

students.  E.I. did not claim that the District or the Middle School was negligent in crafting its anti-bullying policies.  Rather, E.I. claimed that the Middle School employees negligently failed to protect her from other students' bullying by, among other things, not following the District's and the Middle School's safety policies that were already in place.  As the Supreme Court explained in *Barner*, such "lower level decisions that merely implement a basic policy already formulated" are not immune from liability under Government Code section 820.2.  (*Barner*, *supra*, 24 Cal.4th at p. 685.)

The District relies on *Skinner v. Vacaville Unified School Dist.* (1995) 37 Cal.App.4th 31 (*Skinner*) and *Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352 (*Thompson*) to argue it is immune from liability under Government Code section 820.2.  In *Skinner*, the appellate court reversed a jury's verdict finding a school district liable for failing to protect the plaintiff student who was injured during a playground fight.  (*Skinner*, at pp. 37–43.)  Relevant here, the court reasoned that the jury's verdict could not be supported by evidence that the school district failed to expel the aggressor student based on his prior behavioral issues at school.  (*Id*. at p. 39.)  The court explained, "[t]he power to expel students from public schools has been entrusted to the governing board of the school district, which must exercise this power pursuant to statutory guidelines [citation] and its own rules and regulations.  [Citation].  Accordingly, the decision falls squarely within the discretionary immunity provision of Government Code section 820.2.  The decision to expel entails 'the resolution of policy considerations, entrusted by statute to a coordinate branch

19

of government, that compels immunity from judicial reexamination.' " (*Id*. at p. 39.)

In *Thompson*, the reviewing court affirmed summary judgment for the school district after the plaintiff student sued the district for injuries he sustained when another student punched him at school. Relevant here, the court rejected the plaintiff's argument that the school district should be held liable for readmitting the aggressor after he was expelled from middle school. (*Thompson*, *supra*, 107 Cal.App.4th at p. 1361.) Relying on *Skinner*, the court in *Thompson* explained, "[t]he decision to readmit a student to school is a matter for which there is statutory immunity. . . . [¶] A school district's exercise of authority to expel and/or readmit a pupil involves the type of decision that entails ' "the resolution of policy considerations, entrusted by statute to a coordinate branch of government, that compels immunity from judicial reexamination." ' " (*Thompson*, at p. 1361.)

*Skinner* and *Thompson* do not compel a finding that the District is immune from liability under Government Code section 820.2. E.I. did not allege that the District or Middle School employees were negligent for failing to expel Skylar. Instead, as we just explained, E.I. alleged that the employees negligently failed to protect her from other students' bullying. The District cites no authority that such conduct qualifies as "quasi-legislative policy-making" entitled to immunity under Government Code section 820.2. (See *Barner*, *supra*, 24 Cal.4th at p. 685; *Caldwell*, *supra*, 10 Cal.4th at p. 981.)

3.    **Substantial evidence of causation**

The District argues insufficient evidence supports the jury's finding that E.I.'s injuries were caused by the Middle School

20

employees' negligent failure to protect E.I. from other students' bullying.  As we explain, the District has waived this argument by failing to discuss all relevant evidence that was presented at trial.

The elements of negligence are:  (1) the defendant's duty to conform to a certain standard of care for the protection of others against unreasonable risks; (2) the defendant's breach of that duty; (3) a reasonably close connection between the defendant's conduct and the resulting injuries, otherwise known as proximate causation; and (4) actual loss suffered by the plaintiff.  (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 279.)

Whether a defendant is negligent, and whether that negligence was a proximate cause of the plaintiff's injuries, generally are questions of fact.  (*J.H.*, *supra*, 183 Cal.App.4th at p. 148.)  We therefore review a jury's finding of causation for substantial evidence.  (*Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569 (*Garbell*).)

"Where findings of fact are challenged on appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor."  (*Garbell*, *supra*, 193 Cal.App.4th at p. 1569.)

"A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable."  (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009)

21

177 Cal.App.4th 209, 218 (*Roman Catholic Archbishop*).)
A reviewing court will not independently review the record to make up for the appellant's failure to carry its burden on appeal. (*Defendant the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.)  Failure to meet this burden waives any claim that the trial court's or jury's finding is not supported by substantial evidence.  (*Roman Catholic Archbishop*, at p. 218.)

In its opening brief, the District addresses only evidence that it claims does not support the jury's causation finding, such as:  (1) testimony from one of E.I.'s experts addressing the adequacy of the Middle School employees' responses to E.I.'s complaints of bullying; and (2) a handful of statements E.I. made about the status of her relationships with Skylar and K.S. throughout the course of the events leading to this case.  The District fails, however, to address a plethora of evidence that supports the jury's finding that the Middle School employees' failure to properly respond to E.I.'s complaints of bullying were a proximate cause of E.I.'s injuries.

For instance, E.I. testified that over the course of several months, she repeatedly notified the Middle School's principal and counselor about the harassing messages Skylar sent her through social media and about how Skylar frequently harassed her on campus.  E.I. also testified that she engaged in self-harming behavior, at least in part, because she believed the Middle School was not taking seriously her complaints about Skylar's behavior.

E.I.'s parents testified that they repeatedly complained to the Middle School's principal about Skylar's behavior and asked the school to take measures to address it.  In addition, E.I.'s psychologist testified about the mental and emotional distress E.I. suffered because of Skylar's behavior, including being

22

diagnosed with PTSD and depression. E.I. also introduced evidence of the District's and the Middle School's failure to follow their own safety plans, which established guidelines for District and Middle School employees to follow when receiving complaints of bullying, including how to prevent bullying, how to punish students who engage in bullying, and how to provide support to students who are the victims of bullying.

By failing to address any of this evidence in challenging the jury's causation finding, the District has waived any argument that insufficient evidence supports that finding. (See *Roman Catholic Archbishop*, *supra*, 177 Cal.App.4th at p. 218.)

**4. Negligent supervision and training**

Next, the District argues the court erred by asking the jury to consider a negligent training and supervision theory on the special verdict form because E.I. dismissed her second cause of action for negligent hiring, retention, supervision, and training. As we explain, even if we were to assume it was error for the court to allow the jury to consider a negligent training and supervision theory, the District has not shown that error was prejudicial.

E.I. alleged in her first amended complaint a second cause of action for negligent hiring, retention, supervision, and training, but she dismissed that cause of action at trial. The special verdict form included four questions about negligence and causation: (1) was the District negligent?; (2) if so, was that negligence a substantial factor in causing E.I.'s injuries?; (3) was the District negligent in training or supervising its employees?; and (4) if so, was that negligent training and supervision a substantial factor in causing E.I.'s injuries? The jury answered "yes" to all four questions.

23

A defective special verdict form is subject to harmless error analysis. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244.) The error is harmless if "under the pleadings and evidence[,] the same result would have been reached even if the error had not been committed." (*Id.* at p. 1245.) As the party challenging the special verdict form, the District bears the burden of showing any error in that form was prejudicial. (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971–972.)

The District argues it was prejudiced by the special verdict form's questions about a negligent training and supervision theory because "there is no way to parse out general negligence damages compared to damages for negligent supervision." We disagree.

Throughout trial, E.I. maintained that she was injured by the Middle School employees' failure to protect her from other students' bullying. E.I. presented evidence that the employees failed to protect her in at least two ways: (1) they did not respond appropriately to her complaints of bullying, including failing to take necessary steps to prevent the bullying; and (2) they were not properly trained or supervised on how to respond to complaints of bullying. But E.I. did not argue, or present evidence suggesting, that she suffered a distinct injury related to each theory. Rather, E.I. relied on the two theories of negligence as alternative ways of establishing the cause of all her injuries that gave rise to this lawsuit.

As we just explained, the jury found the District negligent under both a general negligence theory and a negligent training and supervision theory. The District makes no effort to explain why, despite the finding of liability on E.I.'s general negligence

24

theory, the jury likely would have awarded E.I. fewer damages if the special verdict form did not include questions about the negligent training and supervision theory. Nor does the District otherwise explain how it likely would have obtained a more favorable verdict but for any error on the special verdict form. The District has therefore failed to show it was prejudiced by the inclusion of questions about negligent training and supervision on the special verdict form.

## 5. Admission of expert testimony

The District next contends the court committed reversible error when it allowed one of E.I.'s experts to testify about certain provisions of the Education Code. We disagree.

An assistant superintendent for a local school district testified as one of E.I.'s experts. The assistant superintendent's testimony addressed, among other things, what steps school personnel should take to investigate complaints of bullying, including how to document complaints of bullying, how to protect students who are victims of bullying, and how to discipline students who engage in acts of bullying. The assistant superintendent also addressed various provisions of the Education Code, including Education Code sections 48900 and 48900.4, and the District's and the Middle School's safety plans addressing bullying. Relying on portions of those code provisions and safety plans, the assistant superintendent opined that the Middle School employees, including the principal and the counselor, did not adequately document and investigate E.I.'s complaints of bullying and, ultimately, failed to protect E.I. from other students' bullying.

The District takes issue with the following portions of the assistant superintendent's testimony: (1) that Education Code

section 48900 addresses "bullying," and school district administrators "are responsible for knowing and implementing and using" that provision "to make sure that students on their campuses are safe"; (2) that Education Code section 48900.4 addresses when a student may be suspended for bullying another student and that none of the students who bullied E.I. were suspended until the end of the 2017–2018 school year; and (3) that certain options for responding to complaints of bullying set forth in unspecified provisions of the Education Code are mandatory.

As a threshold matter, the District waived any claim of error arising out of the third challenged statement. The District elicited that testimony during the assistant superintendent's cross-examination, and the District did not ask the court to strike the testimony or admonish the jury not to consider it. Where, as here, "an appellant offers inadmissible matters into evidence, [it] cannot complain of its admission on appeal." (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555.)

In any event, even if we were to assume the challenged portions of the assistant superintendent's testimony should have been excluded, the District has not shown how it was prejudiced by their admission. "A fundamental rule of appellate review is that the appellant must affirmatively show *prejudicial* error." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 403.) To meet this burden, the "appellant must provide an argument and legal authority to support [its] contentions. This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they

26

are] . . . waived.' " (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*).)  Accordingly, an appellant waives contentions that are conclusory and not supported by cognizable legal argument or analysis.  (*Id.* at p. 852; *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948–949.)

In the section of its opening brief challenging the admission of the assistant superintendent's testimony, the District makes no effort to explain how it was prejudiced.  Instead, the District simply asserts, in conclusory fashion, that permitting the expert "to testify as to statutory construction and meaning was erroneous and reversal of the judgment is required on this ground."  This argument falls far short of meeting the District's burden to affirmatively show prejudicial error.  (See *Benach*, *supra*, 149 Cal.App.4th at p. 852.)

In the final section of its opening brief, which addresses why the various claims of error it raises on appeal are "singularly and collectively" prejudicial, the District devotes a single paragraph to explaining why it was prejudiced by the admission of the assistant superintendent's challenged testimony:  "The trial court improperly allowed [the assistant superintendent] to interpret the Ed[ucation] Code statutes and to tell the jury what they mean.  The jury was allowed to pick which expert they believed.  The trial court should have construed the statute[,] and had expert testimony by [the assistant superintendent] been prohibited, then a defense verdict would have been probable.  Further, [the assistant superintendent's] testimony was speculative and unsupported by the evidence."

This argument also is conclusory and does not meet the District's burden to affirmatively show it was prejudiced by the admission of the assistant superintendent's testimony.  For

27

instance, the District fails to explain why allowing the jury to "pick which expert they believed" was prejudicial, let alone erroneous. In fact, the District does not explain who the other expert witnesses are or what testimony they offered at trial. The District also does not explain why a defense verdict would have been more likely had the court excluded the assistant superintendent's testimony. That is, the District does not address any other evidence presented at trial supporting the jury's finding that the District was negligent and explain why, despite that evidence, it is reasonably likely the jury would have reached a more favorable verdict.

**6.     Attorney misconduct**

The District next contends that E.I.'s counsel committed misconduct during her closing argument. Specifically, the District argues that counsel violated a stipulation not to reference either party's wealth or financial status. The District forfeited this argument by not objecting to counsel's argument or asking the trial court to issue a curative admonition.

Before trial, E.I. and the District entered the following stipulation: "[N]either [E.I.] nor [the District] will mention the wealth or poverty of either the defendant or plaintiff. Their respective financial positions will be excluded from the trial of this matter. No witness, expert or attorney will comment upon the financial position of either party."

At trial, the District's superintendent testified that Skylar's parents were "Superintendent's Round Table" members of the Education Foundation, a foundation comprised of businesses, parents, and members of the community who support the District's schools. The Education Foundation raises funds for the District's schools, and Skylar's family donated to the foundation.

Skylar's mother was on the foundation's board of directors, and one of Skylar's family's close friends was the chief executive officer of the Education Foundation. The superintendent confirmed that one needed to donate a "certain level of amount to the District" to become a member of the "Superintendent Round Table."

During her closing argument, E.I.'s counsel stated, "So here we have the Ed[ucation] Foundation, a check that [the superintendent] over here got from the Ed[ucation] Foundation for 1.3 million. In reviewing the evidence yesterday, that stuck out. The school district decided to take money from the Ed[ucation] Foundation and the donors, substantial donors, at the expense of my client's mental health. They should pay for that harm. [¶] . . . but I thought that was a good benchmark for you." The District did not object to counsel's statement that the District's superintendent received a $1.3 million check from the Education Foundation or ask the court to admonish the jury not to consider that statement.

Generally, a party cannot complain on appeal of attorney misconduct unless the party timely objected to the alleged misconduct and asked the court to admonish the jury. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 286 (*Hernandez*).) The failure to timely object and request an admonition waives any claim of error unless the complaining party can show that the misconduct was so prejudicial that it could not be cured by an admonition, an objection or request for admonition would have been futile, or the court promptly overruled an objection and the objecting party had no opportunity to request an admonition. (*Ibid.*) " 'Attorney misconduct is incurable only in extreme cases.' " (*Ibid.*)

29

The District claims it did not object to counsel's argument for strategic reasons, because an "objection serves to highlight the 1.3 million dollar reference." The District also asserts that an admonition "would not serve to unring the bell as the jury already heard it" and that counsel's argument was "extremely prejudicial in and of itself."

The District fails to explain, however, why an admonition would not have cured any potential harm caused by counsel's challenged argument or why that argument was so prejudicial that the District's failure to object to the argument should be excused. Because the District has not sufficiently developed these arguments, we disregard them. (*Hernandez*, *supra*, 37 Cal.App.5th at p. 277 ["We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions [it] wants us to adopt' "].)

In short, the District has forfeited any challenge to counsel's argument addressing money received by the District because it did not object to that argument or otherwise ask the court to admonish the jury not to consider it. (*Hernandez*, *supra*, 37 Cal.App.5th at p. 286.)

**7.    New issues raised on reply**

In its reply brief, the District raises several new arguments that it did not raise in its opening brief. We briefly address why we reject these arguments.

First, the District argues E.I. was prohibited from relying on the District's and the Middle School's anti-bullying policies to show the Middle School employees negligently failed to protect her from other students' bullying. To support this argument, the District quotes the following portion of Evidence Code

30

section 669.1: "A rule, policy, manual, or guideline of state or local government setting forth standards of conduct or guidelines for its employees in the conduct of their public employment shall not be considered a statute, ordinance, or regulation of that public entity within the meaning of Section 669, unless the rule, manual, policy, or guideline has been formally adopted as a statute, as an ordinance of a local governmental entity in this state empowered to adopt ordinances, or as a regulation by an agency of the state pursuant to the Administrative Procedure Act . . . ." Relying on this language, the District argues that E.I. improperly relied on the District's and the Middle School's anti-bullying policies to establish the "standards of conduct of school district employees."

The District has waived this argument by failing to raise it in their opening brief. (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1318 (*City of Palo Alto*) [reviewing courts generally will not consider arguments raised for the first time on reply when those arguments could have been raised in the opening brief].) In any event, the argument lacks merit.

The District ignores the final sentence of Evidence Code section 669.1, which states, "[t]his section affects only the presumption set forth in Section 669, and is not otherwise intended to affect the admissibility or inadmissibility of the rule, policy, manual, or guideline under other provisions of law." (Evid. Code, § 669.1.) As our Supreme Court has explained, a public agency's employee policies or manuals cannot, on their own, create the applicable standard of care, but they may be considered by the trier of fact in determining whether a public

31

employee was negligent in a particular case. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 720–721.)

The District fails to explain why E.I. could not rely on the District's and the Middle School's anti-bullying policies in determining whether the Middle School employees' conduct fell below the standard of care that school personnel generally owe students to protect them from harm. The District has therefore not shown any error, let alone reversible error, arising out of E.I.'s reliance on the District's and the Middle School's anti-bullying policies to support her negligence claim.

Second, the District asserts that E.I. stopped receiving harassing texts and social media messages from Skylar once she blocked Skylar on her text messaging and social media accounts, and that E.I. only began receiving such messages again once she unblocked Skylar from those accounts. The District does not explain why these facts are relevant to the issues raised in its opening brief, nor does it cite any case law, or offer any cogent argument, explaining why these facts support reversing any aspect of the judgment. We therefore disregard this portion of the District's reply brief. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799 [" ' "Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived" ' "].)

Third, the District argues Skylar's "name calling does not equate to bullying." According to the District, E.I. proved, at most, that she and her classmates engaged in "isolated events of inappropriate behavior," including " 'simple acts of teasing and name-calling,' " but she did not prove that she was ever bullied by other students at the Middle School. Because the District did not raise this argument in its opening brief, and it does not explain

32

why it could not do so, we disregard it.  (*City of Palo Alto*, *supra*, 5 Cal.App.5th at p. 1318.)

**8.      Cumulative prejudice**

Finally, we reject the District's assertion that even if the various instances of error it raises on appeal were not prejudicial on their own, the cumulative effect of those errors was prejudicial.  As we already explained, the District has not established error for most of the issues it raises on appeal.  For those issues where we have assumed error, the District has not met its burden to show any prejudice.  Thus, there is no prejudice to cumulate.

## DISPOSITION

The judgment is affirmed.  The District shall bear its costs on appeal.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


33